JAMES A. REGAS *et al.*, Plaintiffs-Appellees, v. CONTINENTAL CASUALTY COMPANY, Defendant-Appellant.

First District (3rd Division)   No. 84—2420

Opinion filed December 11, 1985.

Cassiday, Schade & Gloor, of Chicago (Kevin G. Burke, of counsel), for appellant.

Peter G. Frezados, of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, James A. Regas and R. Kymn Harp, brought a declaratory judgment action against defendant, Continental Casualty Company, to determine their rights under a policy of insurance for legal malpractice issued by Continental, and to recover any proceeds due. Continental had refused to defend plaintiffs in an action brought by a third party which resulted in a judgment against plaintiffs. Both sides sought summary judgment in the present case, and the trial court granted plaintiffs' motion and entered judgment against Continental in the amount of $30,000. Continental appeals.

Continental issued a policy of insurance for legal malpractice coverage to plaintiffs, as attorneys with the firm of Regas and Frezados, a/k/a James A. Regas & Associates of Chicago. The policy provides in pertinent part:

"To pay on behalf of the insured, all sums which the insured shall become legally obligated to pay as damages:

1. arising from the performance of professional services for others in the insured's capacity as a lawyer, real estate title insurance agent or notary public because of an act or omission of the insured or of any other person or firm for whose act or omission the insured is legally responsible.
* * *

When the insured acts as an administrator, conservator, executor, guardian, trustee, receiver, or in any other similar fiduciary activity, any act or omission committed by the insured in such capacity shall be deemed to have been committed during the performance of the insured's professional services.
* * *

The Company [Continental] shall have the right and duty to defend any suit against the insured seeking damages which are payable under the terms of this policy * * * even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems appropriate; * * *."

During the fall of 1982, plaintiffs represented Karen S. Hettenbach in the purchase and resale of an art collection. On December 23,

1982, Hettenbach requested that Harp, an attorney employed by Regas, represent her in the closing of a real estate transaction in Indiana on that day. Hettenbach was purchasing an interest in certain real property. The funds for the purchase were to be transferred to Hettenbach on December 23 at the Southern Indiana Bank and Trust Company (bank) in Evansville, Indiana. That morning Harp was informed by Elmer Lant, president of the bank, that the funds for the purchase had not arrived at the bank. Thereafter, Hettenbach informed Harp that the necessary funds would be transferred into the law firm's escrow account at a bank in Chicago. This escrow account existed only for the receipt and distribution of clients' funds, and Hettenbach had previously used the account in connection with the art transaction.

Harp made several telephone calls to determine if the funds had arrived in his firm's escrow account, but was told that the account had not received the funds. Hettenbach also made several calls in an attempt to secure and verify a transfer of funds to the account. Without the transfer of funds, it was not possible to close the real estate transaction. Finally, Lant suggested that Hettenbach obtain an escrow check from plaintiffs to cover the down payment of $675,000. Lant informed Hettenbach that he had bank-to-bank confirmation that the funds had been wire-transferred to plaintiff's account. After a telephone conversation with Regas, plaintiffs agreed to issue the escrow check on the conditions that Lant verify that the necessary funds had been wire-transferred to the escrow account and would arrive by the following Monday; that Lant agree not to deposit the check drawn on the escrow account until there was a confirmation of receipt of the funds into the escrow account; and that plaintiffs would stop payment on the check if the funds were not received. Lant orally agreed to these conditions.

Harp then wrote the check drawn on the escrow account for $675,000 made payable to the bank. The escrow account did not have sufficient funds to cover the check, nor did it contain any funds of Hettenbach at that time. Hettenbach did not offer to guarantee payment of the escrow check. After receiving the check, Lant directed the bank to issue cashier's checks to the sellers of the property. Lant did not issue the cashier's check until receipt of the escrow check because he had told the sellers that the funds had been received by the bank. Neither Harp nor Hettenbach told the sellers that there were insufficient funds of Hettenbach to purchase the property.

No funds were transferred to the escrow account on behalf of Hettenbach by Monday, December 27, the next regular business day.

In response, plaintiffs stopped payment on the escrow check to the bank on December 28. They also notified the bank by mailgram that payment had been stopped. By letter dated January 10, 1983, the bank made a formal demand upon plaintiff law firm to deliver $675,000, which was refused. By letter dated January 24, 1983, plaintiffs notified Continental of a possible claim subject to coverage under their insurance policy, related the facts and circumstances surrounding the transaction, and forwarded the bank's letter.

On February 9, 1983, the bank filed suit against plaintiffs in the Federal district court for the Southern District of Indiana. According to count I, plaintiffs issued an escrow check to the bank knowing that it would not be honored or paid, which constituted "check deception." (Ind. Code secs. 35—43—5—5, 34—4—30—1 (1981).) Count II charged a violation of the Indiana Code which provides that one who delivers a check payable to a financial institution, and stops payment on the check without legal cause, if found liable in a court action, is also liable for interest of 18% per annum on the check amount from the date of its execution until payment in full. (Ind. Code sec. 28—2—8—1 (1981).) The bank sought recovery of $675,000 plus treble damages, costs and attorney fees. On February 16, 1983, when Harp was served, he transmitted the summons and complaint to Continental along with an explanatory letter. In March 1983, Harp again notified Continental of the potential claim and enclosed sworn statements from himself and Hettenbach, setting forth facts relating to the bank's claim.

On May 5, 1983, the bank filed an amended complaint against plaintiffs, adding a third count. Count III alleges in pertinent part:

"2. That Defendant James A. Regas & Associates, conducted business as a law firm utilizing their account with American National Bank & Trust Company of Chicago for the purpose and in the course of legal representation.

3. That Defendant R. Kymn Harp, was at all relevant times hereto an attorney in the law firm of James A. Regas & Associates and was acting in his capacity as an attorney in the representation of his clients.

4. That said check #3387 was delivered by Defendant Harp to Plaintiff in Warrick County, Indiana upon the direction of his clients.

5. That Defendants knowingly and/or intentionally issued check #3387 in order to acquire for their clients the above-mentioned checks and to receive credit for the aforementioned deposit knowing said clients had not provided, but had only prom-

ised, Defendants with the funds for check #3387.

6. That subsequent to Plaintiff's issuance of the above-delineated checks and deposit, Defendants failed to receive the funds from their clients for check #3387. Without receipt of the clients' funds, Defendant stopped payment on their escrow check #3387.

7. That as a result of these actions of the Defendant, the Plaintiff has suffered pecuniary loss in the amount of Six Hundred Seventy-five Thousand Dollars ($675,000), said amount representing the funds from check #3387."

By letter dated May 10, 1983, plaintiffs forwarded a copy of the amended complaint to Continental, tendered defense and advised Continental that the bank was willing to settle the claim for $30,000. On May 31, plaintiffs advised Continental that they had not received a response to their request for a defense, and that the bank was proceeding with discovery on the underlying claim. On August 31, plaintiffs again notified Continental of the settlement offer and demanded that Continental settle the lawsuit by paying $30,000 to the bank. Continental did not assume the defense or pay indemnity costs.

On October 13, 1983, judgment was entered against plaintiffs in the Federal suit in the amount of $30,000. On October 26, plaintiffs brought this action against Continental seeking a declaration that Continental was obligated to defend them in the suit brought by the bank. Plaintiffs also sought recovery of the judgment entered against them, attorney fees and expenses incurred in defense of that suit and exemplary damages as well as attorney fees and costs incurred in this action. Both sides sought summary judgment and, on September 17, 1984, the court granted summary judgment to plaintiffs for $30,000. The court denied plaintiffs' request for attorney fees and exemplary damages but reserved ruling on the issue of plaintiffs' request for fees to defend the underlying action.

Continental contends on appeal that it correctly denied coverage because the issuance of the escrow check by plaintiffs on behalf of their client, without funds to support the check, to complete the client's real estate purchase does not constitute the practice of law.

■ An insurer is obligated to defend an action against its insured if the complaint sets forth allegations which are within or potentially within the coverage of the policy. (*Clemmons v. Travelers Insurance Co.* (1981), 88 Ill. 2d 469, 430 N.E.2d 1104.) The complaint must be liberally construed and all doubts as to coverage must be resolved in favor of the insured. (*La Rotunda v. Royal Globe Insurance Co.* (1980), 87 Ill. App. 3d 446, 408 N.E.2d 928.) The insurer can justifi-

ably refuse to defend only when the allegations of the complaint clearly show that the claim is beyond the policy coverage. (*Reis v. Aetna Casualty & Surety Co.* (1978), 69 Ill. App. 3d 777, 387 N.E.2d 700.) When an insurer wrongfully refuses to defend a complaint, it is liable to the insured for breach of contract and damages in the amount of judgment against the insured or a reasonable settlement, plus any expenses incurred. *Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335.

The amended complaint by the bank alleged that the plaintiff law firm used its escrow account in the course of its legal representation. It further alleged that Harp was acting in his capacity as an attorney in the representation of his clients when he delivered the check to the bank at the direction of his clients. The policy at issue insured plaintiffs for damages "arising from the performance of professional services for others in the insured's capacity as a lawyer." According to the policy, when plaintiffs engaged in "fiduciary activity" any act or omission committed by them in such capacity "shall be deemed to have been committed during the performance of their [the insured's] professional services." The intent of the parties was to insure situations where plaintiffs rendered professional services for others as lawyers or engaged in the practice of law. See *Mendelsohn v. CNA Insurance Co.* (1983), 115 Ill. App. 3d 964, 451 N.E.2d 919.

Our supreme court has described the practice of law as:

" '*** [T]he giving of advice or rendition of any sort of service by any person, firm or corporation when the giving of advice or rendition of such service requires the use of any degree of legal knowledge or skill.' " (*People ex rel. Illinois State Bar Association v. Schafer* (1949), 404 Ill. 45, 51, 87 N.E.2d 773.)

Furthermore, the Model Code of Professional Responsibility drafted by the American Bar Association states that the practice of law cannot be specifically defined but it "relates to the rendition of services for others that call for the professional judgment of a lawyer." Model Code of Professional Responsibility EC 3—5 (1981); See *Mendelsohn v. CNA Insurance Co.* (1983), 115 Ill. App. 3d 964, 451 N.E.2d 919.

■ Guided by these principles, we conclude that plaintiffs' conduct in writing a check on their escrow account to assist in the transfer of client's funds for a real estate closing constitutes the practice of law. The management of all the requirements and execution of instruments necessary to close a real estate transaction demand legal skill and knowledge as well as professional judgment. (See *Chicago Bar Association v. Quinlan & Tyson, Inc.* (1966), 34 Ill. 2d 116, 214 N.E.2d 771.) While plaintiffs may not have exercised good judgment

in writing the escrow check for their client, they nevertheless performed a professional service to their client in their capacity as lawyers by attempting to complete one of the requirements for the real estate closing. We hold, therefore, that the amended complaint in the underlying action alleged a potential claim against plaintiffs within the policy coverage. Accordingly, Continental breached its duty to defend plaintiffs.

■ We reject Continental's argument that plaintiffs' delivery of the $675,000 check to the bank constituted a loan or advance of funds to their client. Plaintiffs issued the check and delivered it to the bank on the basis of several conditions which were not met. Such conditional delivery did not create a binding contract between plaintiffs and the bank (*Schranz v. I.L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 412 N.E.2d 1378), and, therefore, could not result in a loan to the client. Additionally, plaintiffs did not advance their own funds on behalf of their client with the expectation of repayment. Plaintiffs' issuance of the check could only have transferred clients' funds in the escrow account. Where plaintiffs did not provide funds for their client's use and their client did not promise to repay the amount, there was no loan. See *In re Stillo* (1977), 68 Ill. 2d 49, 368 N.E.2d 897.

■ We also reject any suggestion that the legal malpractice policy does not apply to situations where plaintiffs are sued in a contract action by a nonclient. Such an interpretation is not supported by the language of the policy which states that the insurer will pay "all sums which the insured shall become legally obligated to pay as damages *** arising from the performance of professional services for others in the insured's capacity as a lawyer." If an attorney engages in activity leading to formation of a contract for a client, and that contract later becomes the basis for a suit against the attorney, such conduct does fall within legal malpractice coverage where it is performed as a professional service. There is no requirement that the underlying action sound in tort where the contract dispute arose during the course of legal representation.

■ Finally, plaintiffs' conduct does not violate the Illinois Code of Professional Responsibility. (87 Ill. 2d R. 1—101 *et seq.*) Disciplinary Rule 5—103(b) prohibits lawyers from advancing funds or guaranteeing financial assistance to a client in pending or potential litigation. (87 Ill. 2d R. 5—103(b).) As we have already noted, plaintiffs did not advance funds to their client but merely assisted in the transfer of client funds. Moreover, plaintiffs attempted this transfer of funds through a client escrow account specifically established for the management of funds of clients separate from the lawyers' funds, in con-

formance with Disciplinary Rule 9—102. 87 Ill. 2d R. 9—102.

In view of our holding that Continental breached its duty to defend plaintiffs in the suit brought by the bank, it is unnecessary to consider the additional argument that Continental is estopped from denying coverage because it failed either to seek a declaration regarding its obligations before or pending trial of the underlying action, or defend plaintiffs under a reservation of rights.

For the reasons stated, the order of the circuit court of Cook County granting summary judgment to plaintiffs in the amount of $30,000 is affirmed.

Judgment affirmed.

WHITE, P.J., and RIZZI, J., concur.